**STATE of Missouri, Respondent,**

v.

**Ralph T. AARON Appellant.**

**No. WD 55672.**

Missouri Court of Appeals,
Western District.

Feb. 23, 1999.

Rebecca L. Kurz, Asst. Public Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Krista D. Boston, Asst. Atty. Gen., Jefferson City, for respondent.

Before Chief Judge BRECKENRIDGE, Presiding, Judge LAURA DENVIR STITH and Judge VICTOR C. HOWARD.

LAURA DENVIR STITH, Judge.

Ralph T. Aaron was convicted of second-degree murder, in violation of Section 565.021.1,[1] and armed criminal action, in violation of Section 571.015, for which he was sentenced to 27 years imprisonment. He appeals, contending the trial court erred in denying his motion for new trial because the State failed to disclose impeachment evidence that the defense could have used to discredit the forensic pathologist, Dr. Berkland. Although we agree that the State should have revealed this evidence, we do not believe, on the facts of this case, that there is a reasonable probability that the outcome would have been different had the evidence been disclosed. Accordingly, the judgment of the trial court is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On January 3, 1996, defendant shot and killed his girlfriend of seven years, Brenda Robinson. Prior to the shooting, defendant repeatedly accused the victim of having an affair with his nephew, and had threatened to kill her. She moved out of his residence about a week before her death, but he convinced her to move back in with him just a few days before the shooting. On the day of the killing, she went to his convenience store after work to help him run the store and to take inventory.

Defendant had spent the day with the victim's brother drinking, smoking marijuana and making threats to kill the victim. Just before the shooting, he waited on a customer with his hand hidden behind his back. The customer did not see what defendant had behind his back, but did see the victim on the phone and noticed that she looked scared and was crying. After the customer walked out of the store, she heard shots, as did the person who was on the phone with the victim. The police arrived and found the victim dead and defendant shot and injured. When the police asked defendant who had shot him, he indicated he had shot himself by pointing to his own head and nodding. When asked who had shot the victim, defendant again pointed to his own head and nodded.

Three shots to the body killed the victim. The police found one spent bullet and three shell casings at the scene. They had been fired from a .40 caliber gun, which they also found at the scene. Dr. Michael Berkland performed the autopsy. At trial, the State offered Dr. Berkland's testimony, and defense counsel stipulated to his credentials. Dr. Berkland testified that the death was caused by multiple gunshot wounds caused by three gunshots, any of which could have been fatal. He stated one of the bullets was fired after the victim was down on the floor, indicating that defendant continued to fire gunshots at the victim after she was already fatally wounded.

Defense counsel presented evidence of diminished capacity and offered testimony from defendant's psychiatrist that defendant acted on impulse under tremendous anger. Another psychiatrist testified that defendant did not have the capacity to form the intent for second-degree murder because, at the time of the shooting, he could not think rationally.

The jury found defendant guilty of second-degree murder and armed criminal action. After the verdict was rendered, defense counsel learned that a complaint had been filed against Dr. Berkland for filing false autopsy reports. Defense counsel filed a motion for new trial alleging that the State withheld exculpatory evidence regarding Dr. Berkland's credibility.

On February 18, 1998, a hearing was held on defendant's motion for new trial. Defense counsel presented evidence that three days after the defendant's trial, the State attacked Dr. Berkland's credentials in a different case in which he testified for the defense, noting he had been fired for incompetence. The

1. All statutory references are to RSMo 1994, unless otherwise indicated.

defense also submitted a deposition of Dr. Thomas Young, the chief medical examiner for Jackson County, who testified to various instances of Dr. Berkland's incompetence and his history of falsifying autopsy reports. However, there was no evidence Dr. Berkland lied on the autopsy report for this case, and the court overruled the motion for new trial and sentenced defendant to a concurrent term of 27 years imprisonment. Defendant now appeals.

## II. STANDARD OF REVIEW

■ We review the trial court's denial of a motion for new trial for abuse of discretion. We find such an abuse when the trial court's ruling clearly offends the logic of the circumstances or when it becomes arbitrary and unreasonable. *State v. McNeal,* 880 S.W.2d 325, 330 (Mo.App.1994).

## III. FAILURE TO DISCLOSE IMPEACHMENT EVIDENCE RELEVANT TO MEDICAL EXAMINER'S CREDIBILITY.

Defendant argues that the State's failure to disclose the evidence about Dr. Berkland, which he could have used to impeach Dr. Berkland's forensic testimony, violated his right to due process under *Brady v. Maryland,* and, thus, requires a new trial.

■ The United States Supreme Court held in *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), that when the State suppresses evidence which may be favorable to a defendant, it violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good or bad faith of the State. As noted in *State v. Carter,* 939 S.W.2d 556 (Mo.App.1997), "*Brady* applies where the undisclosed evidence reveals that: (1) the prosecution's case includes perjured testimony: (2) where defense counsel makes a general pretrial request for "all *Brady* material" or anything "exculpatory," and (3) where defense counsel makes a request for specific evidence." *Id.* at 557. *See United States v. Agurs,* 427 U.S. 97, 103–07, 96 S.Ct. 2392, 2397–99, 49 L.Ed.2d 342 (1976).

■ Defendant argues that he made a request for exculpatory evidence, and that disclosure of the evidence about Dr. Berkland was exculpatory and possibly could have assisted his defense. Specifically, he argues that the doctor's testimony that one shot was probably fired while the victim lay on the ground tended to undercut his defense of lack of capacity to plan the shooting and that he acted on impulse.

■ While we agree that the evidence surrounding Dr. Berkland's work history was exculpatory and that the State should have disclosed it to the defense, we do not agree that this failure entitled defendant to a new trial. As Defendant recognizes, the failure to disclose *Brady* evidence will require a new trial only if the defendant shows the undisclosed evidence is "material." *United States v. Bagley,* 473 U.S. 667, 678 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985). Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *State v. Schlup,* 785 S.W.2d 796, 800 (Mo.App.1990).

In evaluating whether the evidence was material here, it is important to note that Defendant does not allege that Dr. Berkland's testimony in this particular case was perjured. Of course, evidence of perjury in this case would be material. Rather, Defendant says that he should simply have been permitted to impeach Dr. Berkland based on his alleged (but as then unproved) perjury and incompetence in other cases.

The State argues that the evidence of incompetence in other cases was not admissible, for it consisted of mere allegations. The Defendant notes that the State itself impeached Dr. Berkland on the basis of his alleged incompetence shortly after the trial in this case, and thus can hardly now claim that it did not know of his incompetence, or that the evidence of his incompetence was improper impeachment. We need not resolve this issue. Here, assuming that the allegations against Dr. Berkland were admissible to impeach him, we find there is no reasonable probability that they would have had an impact on the verdict.

Defendant did not claim that he did not shoot the victim, or that she did not die from gunshot wounds he administered. Indeed, he admits he committed the crime. His defense at trial was, rather, that he should not be found guilty of second-degree murder because he had diminished capacity at the time of the killing due to a major depressive disorder, for which he was being treated with therapy and medication. He claimed this prevented him from intentionally killing the victim. In support, he presented the testimony of two doctors that he would have had a hard time controlling himself or having the capacity to know what he was doing with this mental and emotional state and in light of his use of alcohol and drugs on the day of the shooting.

Defendant did not present any medical testimony at trial contesting Dr. Berkland's factual findings as to the cause or manner of death, however. Even now, he does not claim that Dr. Berkland's testimony about how the victim died or where the bullets struck her was inaccurate. He simply says that, if he had been able to ask Dr. Berkland about inaccurate autopsies in other cases, the jury might have disbelieved Dr. Berkland's testimony about the manner of death here.

As just noted, however, the manner of death was not contested at trial, and is not even contested on appeal. And, that is all Dr. Berkland testified to. He testified that the victim was shot three times; one shot was to the right temple, one went through the right shoulder and pierced the lung, heart and liver, and a third, the last, entered the left buttocks and traveled through the liver and lung to the neck. He said any of these shots could have been fatal. He gave no opinion as to whether Mr. Aaron had the capacity to form the intent to kill at the time of the shooting.

Defendant does not contest any of the physical facts testified to by Dr. Berkland, nor has he offered any explanation as to how the angle at which the shots were fired could show whether they were fired intentionally or while in a state of diminished capacity. He simply asks us to speculate that it might have done so, even though he does not contest the accuracy of Dr. Berkland's testimony.

We decline the invitation to speculate. Whatever angle the bullets went into the body, Defendant admits he shot the victim and she died from the shots, and that he then shot himself. No inaccuracies in Dr. Berkland's testimony about the specific trajectories of the bullets could have added to or undercut this diminished capacity defense. For this reason, while we find that the State erred in failing to reveal the requested information, we also find that there is no reasonable probability it affected the outcome of the trial. Judgment affirmed.

Chief Judge BRECKENRIDGE, Presiding, and Judge VICTOR C. HOWARD concur.